# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 09-3231/3233/3362
_____

Planned Parenthood Minnesota,     *
North Dakota, South Dakota; Carol E.     *
Ball, M.D.,     *
    *
       Appellees/Cross     *
       Appellants,     *
    *
   vs.     *
    *
Mike Rounds, Governor; Marty J.     *
Jackley, Attorney General, in their     *
official capacities,     *
    *
       Appellants/Cross     *
       Appellees,     *   Appeals from the United States
    *   District Court for the
Alpha Center; Black Hills Crisis     *   District of South Dakota.
Pregnancy Center doing business as     *
Care Net; Dr. Glenn A. Ridder, M.D.;     *
Eleanor D. Larsen M.A., L.S.W.A.,     *
    *
       Appellants/Cross     *
       Appellees.     *
    *
_____     *
    *
Christian Medical & Dental     *
Associations; American Association     *
of Pro-life Obstetricians &     *
Gynecologists; Catholic Medical     *
Association; Physicians for Life;     *
National Association of Pro-Life     *

Nurses; Family Research Council; Care    *
Net; Heartbeat International,               *
Incorporated; National Institute of     *
Family and Life Advocates,           *
Incorporated,                       *
                                      *
          Amici Curiae.           *
                                        *

_____

Submitted: January 11, 2011
Filed: September 2, 2011
_____

Before MURPHY, MELLOY, and GRUENDER, Circuit Judges.
_____

MURPHY, Circuit Judge.

Planned Parenthood of Minnesota, North Dakota, South Dakota and its medical director Dr. Carol E. Ball (collectively Planned Parenthood) brought this equitable action against Governor Mike Rounds and the South Dakota Attorney General[1] (collectively South Dakota) in their official capacities seeking to enjoin enforcement of revisions enacted in 2005 to the South Dakota law on informed consent to abortion. Alpha Center and Black Hills Crisis Pregnancy Center, crisis pregnancy centers located in South Dakota, and their individual staff members intervened. In 2008 our court sitting en banc reversed a preliminary injunction granted to Planned Parenthood in the district court and remanded for further consideration.[2] On remand the district

_____

[1] Marty J. Jackley, the current Attorney General of South Dakota, is the successor to Larry Long who held that office when this case was initiated.

[2] Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 735–36 (8th Cir. 2008) (en banc) (six judges in the majority; one judge concurring in the judgment; four dissenting).

court granted summary judgment on four statutory provisions challenged by Planned Parenthood, upholding some and striking down others as unconstitutional under the First and Fourteenth Amendments. Planned Parenthood, South Dakota, and the intervenors appeal. After careful consideration of the individual statutory provisions and the arguments of the interested parties, we affirm in part and reverse in part.

I.

In 2005 South Dakota enacted House Bill 1166 (the Act) which is the subject of this action. The Act amended South Dakota's Public Health and Safety Code, expanding the requirements for informed consent to abortion. Under § 7 of the Act, each woman contemplating abortion is to be given oral advisories[3] twenty four hours in advance of the procedure by the doctor scheduled to perform the abortion or by the doctor's designee. The doctor must give other written advisories at least two hours before the procedure.

The written advisories required by § 7(1) are to inform the patient

(b) That the abortion will terminate the life of a whole, separate, unique, living human being [the human being advisory];

(c) That [the patient] has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota;

(d) That by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated [collectively the relationship advisories].

---

[3]Although the district court and the parties have used the word "disclosure" in connection with information mandated by the Act, we believe the term "advisory" more precisely describes the process required by the law.

-3-

S.D.C.L. § 34-23A-10.1(1)(b)–(d). The advisory must further contain "[a] description of all known medical risks of the procedure" (the risk advisory). Id. § 34-23A-10.1(1)(e). That description must include "[i]ncreased risk of suicide ideation and suicide" as a known risk of abortion (the suicide advisory). Id. § 34-23A-10.1(1)(e)(ii). The Act also requires doctors to provide patients with the name, address, and telephone number of a nearby crisis pregnancy center twenty four hours before the scheduled procedure. Id. § 34-23A-10.1(2)(c).[4]

After the patient has read the written portion of the required communications, § 7 requires that she sign each page of the statement verifying that she has understood all the information provided. Id. § 34-23A-10.1(1) ¶ 2. If she asks about any of the required advisories or has any other significant question, the doctor must respond in writing. Id. That response becomes part of the patient's permanent medical record. Id. Once all of the required communications have been made, the doctor must certify that the patient "understands the information imparted." Id. A doctor who performs an abortion without meeting these requirements is subject to criminal prosecution. Id. § 34-23A-10.2 ¶ 1.

Before the Act was scheduled to take effect in 2005, Planned Parenthood brought its facial challenge to the constitutionality of the statute under the First and Fourteenth Amendments. It moved for a preliminary injunction enjoining its enforcement. The district court held in Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 375 F. Supp. 2d 881(D.S.D. 2005), that the human being advisory violated doctors' First Amendment rights on its face and that invalidation of any portion of the Act required injunctive relief. While a divided panel of this court affirmed, 467 F.3d 716 (2006), its decision was overturned by the en banc court which reversed, holding that the required human being advisory did not on its face violate

_____

[4]After this appeal was submitted South Dakota enacted additional informed consent requirements. South Dakota H.B. 1217, 2011 Session. We do not consider those requirements here since they were not before the district court.

the First Amendment.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 735–36 (8th Cir. 2008) (en banc).  It vacated the preliminary injunction and remanded to the district court for resolution of Planned Parenthood's other facial challenges to the Act.  Id. at 738.

On remand South Dakota and the intervenors moved for summary judgment in their favor as to the human being advisory, the relationship advisories, the suicide advisory, and the risk advisory.  Planned Parenthood in turn moved for summary judgment in its favor as to the latter three provisions, as well as two others not at issue on appeal.  The district court granted summary judgment in favor of South Dakota on the human being and risk advisories and in favor of Planned Parenthood on the relationship and suicide advisories.  South Dakota and the intervenors[5] now appeal the rulings in Planned Parenthood's favor, and Planned Parenthood cross appeals the rulings in South Dakota's favor.

## II.

On appeal from a district court's grant of summary judgment we review findings of fact for clear error and conclusions of law de novo.  Royer v. City of Oak Grove, 374 F.3d 685, 687 (8th Cir. 2004).

## A.

Planned Parenthood continues to challenge a provision that the en banc court has already upheld in Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724,

---

[5]Planned Parenthood has moved to strike the intervenors' main brief on appeal for referencing a document stricken by the district court.  Since the cited materials appear elsewhere in the record and were not themselves stricken, the motion to strike is denied, as is the intervenors' mooted motion for supplemental briefing.

737 (8th Cir. 2008), as did the district court on our subsequent remand. 650 F. Supp. 2d 972, 976 (D.S.D. 2009). This provision is in section 7(1)(b) which requires doctors to provide patients with certain advisories which include a written statement "with the following information: . . . That the abortion will terminate the life of a whole, separate, unique, living human being." S.D.C.L. § 34-23A-10.1(1)(b). A separate code section defines a human being as "an individual living member of the species of Homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation." Id. § 34-23A-1(4). To comply with § 7, a doctor must certify in writing that he or she believes that the woman understands this statement. Id. § 34-23A-10.1 ¶ 2.

The human being advisory requires that the pregnant woman be told that an abortion will "terminate the life of a whole, separate, unique, living human being." The en banc court held that this provision withstood a First Amendment challenge because it must be read together with the Act's definition of human being. 530 F.3d at 735. Because "human being" has only a "narrow, species-based" meaning in this context, the advisory conveys "scientific[] and factual[]" information that "should be clear in context to a physician." Id. at 736. Planned Parenthood now argues that in focusing on the statutory definition of "human being" in § 34-23A-1(4), Rounds implicitly held that South Dakota may not compel doctors to use the exact language of the human being advisory contained in § 34-23A-10.1(1)(b). South Dakota responds that Rounds upheld that human being advisory unconditionally.

It is significant here that Planned Parenthood has challenged § 7 on its face, not as applied to any particular party or circumstance. Our court has recognized that facial challenges to abortion statutes can succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 895 (1992). This standard is somewhat different

-6-

than that applicable to facial challenges in general, where the proponent must establish that "no set of circumstances exists under which the [statute] would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Our court has joined every other circuit which has decided the issue[6] by "adopt[ing] the standards enunciated by the Casey plurality opinion as controlling precedent in abortion cases." Rounds, 530 F.3d at 734 n.8. The Supreme Court has chosen not to intervene. Gonzales, 550 U.S. at 167.

The en banc court rejected Planned Parenthood's facial challenge to the human being advisory under the same standard we apply today. Planned Parenthood has not demonstrated that the human being advisory would present an undue burden "in a large fraction of the cases in which [it] is relevant." 505 U.S. at 895. In reaching that conclusion our court did not imply that as a matter of statutory construction, § 7(1)(b) forces doctors to use its exact words. Having already upheld the statute's facial validity, we decline to go further since Planned Parenthood has not brought an as applied challenge to § 7. It is neither the judiciary's "obligation nor within [its] traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop." Gonzales, 550 U.S. at 168. Only an "as applied" challenge would be an appropriate vehicle to consider the case of a doctor using other language in giving this advisory.

---

[6] The five other circuits which have decided the standard for facial challenges in the abortion context have all chosen Casey's. See Cincinnati Women's Servs., Inc. v. Taft, 468 F.3d 361, 370 (6th Cir. 2006); Planned Parenthood of N. New England v. Heed, 390 F.3d 53, 58 (1st Cir. 2004), vacated on other grounds sub nom. Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320 (2006); Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 920 (9th Cir. 2004); Planned Parenthood of the Rocky Mountains Servs. v. Owens, 287 F.3d 910 (10th Cir. 2002); Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127, 142 (3d Cir. 2000).

Because Rounds upheld the human being advisory against a facial challenge, the district court certainly did not err in doing the same. It should therefore be affirmed.

B.

Planned Parenthood also challenges the § 7 requirement that before performing an abortion doctors must tell each pregnant woman "that [she] has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota." S.D.C.L. § 34-23A-10.1(1)(c). Doctors must further advise each woman that "by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated." Id. § 34-23A-10.1(1)(d). Planned Parenthood has facially challenged the relationship advisories under the Fourteenth and First Amendments as unduly burdening a woman's fundamental right to have an abortion and as compelling physicians' speech beyond a reasonable regulation of the practice of medicine. The district court found the relationship advisories unconstitutional without identifying a specific constitutional basis for that decision.

On appeal, the parties disagree as to the meaning of the relationship advisories as well as their constitutionality. South Dakota represented at oral argument that the relationship advisories "can be taken to mean that the Constitution protects a woman from being forced to have an abortion."[7] The advisories responded to the South Dakota legislature's concern that "people getting abortions . . . feel coercion, they feel pressure, they feel alone." Id. When asked at oral argument whether having a "protected relationship" means that a woman "can't be forced to have an abortion,"

_____

[7]A recording of the argument is available at http://8cc-www.ca8.uscourts.gov/OAaudio/2011/1/093231.mp3.

counsel for the state answered, "Yes, absolutely." He went on to say that the relationship advisories "can be taken to mean that the Constitution . . . protect[s] a woman from being forced to have an abortion . . . and that the laws of the state of South Dakota also protect a woman's relationship. That's really all you have to say. That's it." The intervenors characterize the relationship as a "relationship in fact."

Planned Parenthood urges that the relationship advisories have no stable meaning and that they unconstitutionally compel ideological speech by doctors since there are "moral and philosophical messages inherent in some of [the advisories' possible] meanings." Brief for Appellee at 39. Without a statutory definition of "relationship" to guide its construction, the statute "certainly [could] be read to make a point in the debate about the ethics of abortion," as the en banc court observed of the human being advisory before considering that provision in the context of the statute as a whole. Rounds, 650 F.3d at 735.

An abortion regulation creates an undue burden and thus violates due process if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 877 (1992). Informed consent requirements "must be calculated to inform the woman's free choice, not hinder it." Id. at 877. Because an informed consent requirement must "facilitate[] the wise exercise" of a woman's right to abortion, such a requirement presents an undue burden unless it provides "truthful and not misleading" information. Id. at 882. As earlier discussed, a party bringing a facial challenge to an abortion statute must show that the law presents an undue burden "in a large fraction of the cases in which [it] is relevant." Casey, 505 U.S. at 895; Rounds, 530 F.3d at 734 n.8 (noting that our court has adopted Casey's standards as controlling).

Planned Parenthood fears the relationship advisories could be construed as requiring informing the woman that abortion is morally wrong, which would hinder

rather than inform her free choice, see Casey, 505 U.S. at 877, and would also require doctors to engage in ideological speech, which a state may not compel even from heavily regulated entities. Wooley v. Maynard, 430 U.S. 705, 714 (1977); Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal., 475 U.S. 1, 8 (1986) (plurality opinion).

The parties have thus offered varying constructions of the South Dakota staute, "by [some] of which grave and doubtful constitutional questions arise and by [an]other of which such questions are avoided." United States v. Adler, 590 F.3d 581, 583 (8th Cir. 2009) (quoting Harris v. United States, 536 U.S. 545, 555 (2002)). The court's "duty is to adopt the latter." Id. at 584. This is especially so since "[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state . . . enforcement agency has proffered." Kolender v. Lawson, 461 U.S. 352, 355 (1983).

With all of this in mind, we adopt the reasonable reading South Dakota proposes and hold that § 7 requires a statement that the woman seeking abortion is legally and constitutionally protected against being forced to have an abortion. Since no one can require her to have an abortion, this reading conveys legal information that is truthful, not misleading, and relevant to the abortion decision. Section 7 itself forbids abortion without a woman's "voluntary . . . consent," S.D.C.L. 34-23A-10.1 ¶ 1, and the Supreme Court has recognized a due process right to have children. Washington v. Glucksberg, 521 U.S. 702, 720 (1997).

Since the relationship advisories thus construed can be constitutionally applied to a "large fraction" of the women to whom they are relevant, 505 U.S. at 895, they are valid on their face. The district court therefore erred in holding them unconstitutional.

C.

Another portion of § 7 challenged by Planned Parenthood requires that doctors describe "all known medical risks" of abortion, including "[i]ncreased risk of suicide ideation and suicide" (collectively suicide). S.D.C.L. § 34-23A-10.1(1)(e)(ii). The district court granted summary judgement in Planned Parenthood's favor in respect to it, holding that this provision would unduly burden a woman's right to voluntary abortion and would violate doctors' First Amendment right to be free from compelled speech. South Dakota and the intervenors appeal, arguing that the suicide advisory presents no undue burden and requires only a truthful and nonmisleading statement. The question on appeal is whether this advisory is "untruthful, misleading or not relevant to the patient's decision to have an abortion." Rounds, 530 F.3d at 735.

We begin by examining what this part of the statute requires doctors to tell patients who have come for abortions. They must describe to the patient "all known medical risks of abortion." Since the word "known" is not defined in the statute, we consider its ordinary meaning. See Gonzales, 550 U.S. at 152. In ordinary use "known" means "generally recognized," "proved," or "familiar to all." Merriam-Webster's Collegiate Dictionary 691 (11th ed. 2007); The American Heritage Dictionary of the English Language 971 (4th ed. 2006); Shorter Oxford English Dictionary 1519 (vol. 1) (6th ed. 2007). Thus, the inclusive statement that "increased risk of suicide and suicide ideation are known medical risks of abortion" must be understood as opining that those conditions are generally recognized, proven, or familiar risks of abortion.

The statute also does not define "risk," but medical dictionaries generally agree on that term's several possible meanings. "Absolute risk" is the "[p]robability that a specified event will occur in a specified population."[8] Stedman's Medical Dictionary

---

[8]The intervenors' expert likewise defined absolute risk as "the chance of developing a disease over a time-period (e.g., a 10% lifetime risk of suicide)."

1701 (28th ed. 2006). "Attributable risk" means "the rate of a disease . . in exposed individuals that can be attributed to the exposure." Id. In respect to the statute's suicide advisory, attributable risk would refer to the rate of suicide attributable to a woman's having had an abortion. "Relative risk" refers to "the ratio of the risk of disease among those exposed to a risk factor to the risk among those not exposed." Id. The other definitions are of unlikely relevance here, as they refer to family related risk or to issues of research design. See Dorland's Illustrated Medical Dictionary 1674 (31st ed. 2007) (defining competing, empiric, and genetic risk). Of special significance in this case is the reality that risk has varying meanings and that its usage is not clarified in the statute.

The dissent assumes without explanation that the legislature must have intended "increased risk" to refer specifically to "relative risk." The legislature's usage of "increased risk" does not support the dissent's theory, however. Attributable risk, absolute risk, and other types of medical risk can also be increased or decreased. Nothing in the advisory forecloses a patient from understanding it to mean that abortion would increase her absolute risk of suicide, for example from two to five percent.

Moreover, in the context of this statute a court cannot assume that the legislature had any one of several competing definitions of medical risk clearly in mind. The suicide advisory appears in the same subsection of § 7 that requires doctors to "descri[be] . . . [all] statistically significant risk factors to which the pregnant woman would be subjected" by abortion. S.D.C.L. § 34-23A-10.1(1)(e). The statute does not define "risk factor." After reviewing expert testimony, however, the district court concluded that "a 'risk factor' refers to a predisposing condition that a patient has before a procedure" rather than a risk resulting from a procedure. 650 F. Supp. 2d at 981 (emphasis added). The statute thus used "risk factor" in a manner inconsistent with its medical meaning, leaving doctors "to guess as to the meaning the legislature intended to give to the phrase." Id. The district court therefore enjoined enforcement

of the "risk factor" provision, a ruling neither South Dakota nor the intervenors have attacked. The district court concluded that the legislative drafters "may not have fully understood the meaning of this phrase as used in the medical profession." Id. It does not appear from the record that the word "risk" was used with the technical precision that the dissent would attribute to it.

Even if we were entitled to incorporate the term "relative risk" into the suicide advisory, rather than to "confine [ourselves] to the language used" in the statute as South Dakota rules of interpretation require, see Langdeau v. Langdeau, 751 N.W.2d 722, 727 (S.D. 2008), the advisory would not be made truthful, nonmisleading, and relevant. "Relative risk" incorporates the concept of a "risk factor," see Stedman's 1701; Dorland's 1674, which may or may not denote causation of an increased risk. See Mosby's Dictionary of Medicine, Nursing & Health Professionals 1634 (8th ed. 2009) (a risk factor "causes a person . . . to be particularly susceptible to an unwanted . . . event") (emphasis added); Taber's Cyclopedic Medical Dictionary 2046 (21st ed. 2009) (risk factor "predisposes an individual to the development of a disease"); Dorland's 685 (denoting a risk factor "may or may not" imply causality); but see Stedman's 697 (a risk factor is "not necessarily causally related to" an increased risk). Nothing in the advisory would prevent the unproven inference that the "increased risk" mentioned in § 7 is increased by abortion. See Stedman's at 1701 (defining "attributable risk").

The record does not demonstrate a generally recognized causal connection between abortion and suicide. In fact, it reveals vigorous debate over whether an apparent statistical correlation results from common cofactors rather than a showing that one causes the other. In the course of evaluating relevant peer reviewed literature, the American Psychological Association concluded that there is no evidence that risk of mental health problems among women who abort unwanted pregnancies is any greater than that of women who miscarry or deliver such pregnancies. Brenda Major

-13-

et al., American Psychological Association, <u>Report of the APA Task Force on Mental Health and Abortion</u> 68 (2008).

Section 7 as written could mislead women who have unwanted pregnancies into believing that choosing abortion would increase their risk of suicide. <u>Id.</u> at 11 (92% of abortions are of unintended pregnancies); <u>see</u> <u>Casey</u>, 505 U.S. at 895 (considering the "large fraction of the cases in which [an abortion statute] is relevant"). The American Psychological Association report illustrates the fallacy of the dissent's proposed rewording of the suicide advisory which would assert that the "relative risk of suicide and suicide ideation is higher for women who abort their pregnancies compared to women in other relevant groups." The critical point is that data are lacking on the most relevant other group—that being women who carry unwanted pregnancies to term. Without that data it is not possible to talk about any effect of abortion on suicide risk.

Before granting summary judgment to Planned Parenthood on this issue, the district court considered a report by South Dakota expert Dr. Elizabeth M. Shadigian, who referenced reports by the American College of Obstetricians and Gynecologists, "the leading professional association of physicians who specialize in the health care of women." 650 F. Supp. 2d at 983. According to Dr. Shadigian, this specialized group of experts has rejected any connection between suicide risk and abortion as did the American Psychological Association. Also relevant to its position that suicide is not generally recognized as a danger of abortion is the labeling for the abortion inducing drug mifepristone. Although the FDA requires prescription drug labels to warn of all "clinically significant adverse reactions" and "other potential . . . hazards," 21 C.F.R. § 201.57(6)(i), it approved a label for mifepristone which did not mention suicide or suicide ideation.

South Dakota and the intervenors cite numerous peer reviewed articles, a portion of which concluded there is a causal relationship between suicide and

abortion. The American Psychological Association report found several of these studies methodologically flawed because they failed to distinguish women with wanted pregnancies from women with unwanted pregnancies in evaluating the mental health effects of various pregnancy outcomes. Testimony by individual women reporting emotional problems after abortion has also been offered by South Dakota and the intervenors; all of these women had abortions either outside of South Dakota or before passage of the state's earlier informed consent provisions.

While the dissent objects that "nothing in the record . . . suggest[s] that abortion as a cause [of suicide] has been ruled out with certainty," it overlooks the fact that "medical risks" is modified in the statute by the word "known." Although the statute requires doctors to warn of all "known medical risks" of abortion, the dissent would read the word "known" out of the statute. S.D.C.L. § 34-23A-10.1(1)(e). Legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty," Gonzales, 550 U.S. at 163, but the suicide advisory asserts certainty on the issue of medical and scientific knowledge where none exists. The advisory thus "very likely . . . require[s] physicians to disclose information that is false." Robert Post, Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech, 2007 U. Ill. L. Rev. 939, 961 (2007). The district court did not err in concluding that the suicide advisory's warning of "known" risks compels untruthful speech by doctors. An untruthful, misleading, or irrelevant advisory violates both a patient's due process rights to voluntary abortion and a doctor's First Amendment rights. Casey, 505 U.S. at 882; Rounds, 530 F.3d at 735.

The required suicide advisory would significantly constrain doctors' exercise of their professional judgment. South Dakota common law already requires doctors to inform patients of all the known material or significant risks of a medical procedure. Wheeldon v. Madison, 374 N.W.2d 367, 375 (S.D. 1985). Thus, if a doctor considers suicide a known material risk of abortion, there is a common law duty to warn patients. Unlike the statutory suicide advisory, this common law rule has

an exception for risks that are extremely remote. Id. It also affords a physician the discretion not to issue a warning which would cause severe emotional distress. Id. The requirements of the suicide advisory would thus be redundant if a doctor were to believe that abortion posed a material risk of suicide to a patient and that advising her of it was unlikely to cause harm. The common law rule would compel a warning in these cases. In other cases the suicide advisory would have the effect of overriding doctors' professional judgment by compelling a statement that a doctor believes immaterial or even dangerous.

Informed consent requirements in the abortion context "must be calculated to inform [a] woman's free choice, not hinder it," facilitating "wise" and "informed" decisions. Casey, 505 U.S. at 877, 887. A compelled medical statement that contradicts in unequivocal terms the leading associations of experts in relevant fields does not serve that end. We conclude that the suicide advisory places a "substantial obstacle in the path of [women] seeking abortion," id. at 878, and thus violates due process. By compelling untruthful and misleading speech, the advisory also violates doctors' First Amendment right to be free from compelled speech that is untruthful, misleading, or irrelevant. Id. at 882; Rounds, 530 F.3d at 735. We conclude that the district court did not err in granting Planned Parenthood summary judgment as to the suicide advisory.

D.

Planned Parenthood has also challenged the risk advisory more broadly. Section 7 requires doctors to inform patients of "all known medical risks" associated with abortion, including but not limited to a few specific illnesses. Planned Parenthood argues that the risk advisory is void for vagueness because it may oblige doctors to warn of obscure or unproven medical risks of abortion. South Dakota responds that the advisory's meaning should be clear to doctors, who already disclose

-16-

"known material or significant" risks in any medical procedure as required by state common law. Wheeldon v. Madison, 374 N.W.2d 367, 375 (S.D. 1985).

As discussed above, "known" means generally recognized, proved, or familiar to all. Since known risks include only generally recognized or familiar risks, a doctor of ordinary intelligence can be reasonably certain how to comply with the statute. Planned Parenthood has not shown that the risk advisory will cause confusion in any case, let alone the quantum of cases required to sustain a facial challenge. The district court did not err in upholding the risk advisory.

E.

For these reasons we reverse the judgment of the district court striking down the relationship advisories; affirm its ruling upholding the human being advisory approved in Rounds; and affirm its rulings upholding the general risk advisory and striking down the suicide advisory. Finally, we remand for further proceedings consistent with this opinion.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts II. A, B, and D of the opinion of the Court, holding that the "human being," "relationship," and general "risk" advisories, respectively, withstand Planned Parenthood's facial constitutional challenges. However, I respectfully dissent from the Court's holding in Part II. C that the "suicide" advisory is untruthful and misleading. While the Court states that the record "does not demonstrate a generally recognized causal connection between abortion and suicide," *ante* at 13, even the evidence relied upon by Planned Parenthood acknowledges a significant, known statistical correlation between abortion and suicide. This well-documented statistical correlation is sufficient to support the required disclosure that abortion presents an "increased risk" of suicide, as that term is used in the relevant medical literature.

-17-

Among other disclosure requirements, the statute requires a physician to provide the following information to a patient seeking an abortion:

> (e) A description of all known medical risks of the procedure and statistically significant risk factors to which the pregnant woman would be subjected, including:
>
>> (i) Depression and related psychological distress;
>> (ii) Increased risk of suicide ideation and suicide[.]

S.D.C.L. § 34-23A-10.1(1). Planned Parenthood does not contend that subsection (i), listing depression and related psychological distress as a known risk of abortion, is untruthful or misleading. Only subsection (ii), listing suicide and suicide ideation (collectively "suicide"), is at issue. To determine if the suicide advisory satisfies constitutional requirements for abortion regulations and compelled speech, I examine first what disclosure actually is required, second whether that disclosure is truthful, and third whether it is non-misleading and relevant to the patient's decision to have an abortion. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 734-35 (8th Cir. 2008) (en banc).

I.

With regard to the disclosure required, Planned Parenthood argues, and the district court agreed, that subsection (ii) must be construed to require a disclosure that abortion *causes* suicide. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 650 F. Supp. 2d 972, 982 (D.S.D. 2009). However, no language in subsection (ii), or in the heading of section 10.1(1)(e), refers to causation. "The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used." *Langdeau v. Langdeau*, 751 N.W.2d 722, 727 (S.D. 2008) (quoting *US West Commc'ns, Inc. v. Pub. Utils. Comm'n*, 505 N.W.2d 115, 123 (S.D. 1993)).

Here, the language actually used by the legislature denotes risk in a medical context: "medical risks," "statistically significant risk factors," "[i]ncreased risk." The term "risk" is not defined in the statute, and it has more than one reasonable definition. South Dakota law requires that such a term "must be construed according to its accepted usage, and a strained, unpractical or absurd result is to be avoided." *Peters v. Spearfish ETJ Planning Comm'n*, 567 N.W.2d 880, 885 (S.D. 1997). Based on what the legislature said, what must be disclosed is that suicide is a "risk" of abortion, applying the accepted usage of the term "risk" in the relevant medical field.

The Court examines no fewer than four medical dictionaries in its quest to find every possible definition of the term "risk," and it finds that at least three of those definitions might be implicated in the advisory, some of which "may or may not denote causation." *Ante* at 13. In my view, this approach sweeps far too broadly. Although the heading of subsection (e) refers to "all known medical risks of the [abortion] procedure," the suicide advisory further incorporates the more precise phrase "[i]ncreased risk." § 34-23A-10.1(1)(e)(ii). As a result, one has to presume that the term "increased risk" has a more precise meaning than the term "risk" by itself. *See Maynard v. Heeren*, 563 N.W.2d 830, 835 (S.D. 1997) ("[N]o wordage should be found to be surplus. No provision can be left without meaning. If possible, effect should be given to every part and every word.") (quoting *Cummings v. Mickelson*, 495 N.W.2d 493, 500 (S.D. 1993)); *see also FCC v. AT & T Inc.*, --- U.S. ---, 131 S. Ct. 1177, 1183 (2011) (recognizing that, in construing a statute, "two words together may assume a more particular meaning than those words in isolation"). In practical terms, the advisory at issue is not applicable to every possible practice of medicine, and thus likely does not encompass every one of the numerous definitions of "risk" encountered in medical dictionaries. Instead, the "increased risk" advisory refers solely to the risk of suicide as it relates to those who undergo an abortion.[9] I

---

[9]The Court trivializes this distinction by noting that any type of medical "risk" can be "increased" or decreased, *see ante* at 12, and by finding that the state legislature did not use the word "risk" with any "technical precision," *ante* at 13

therefore turn to the medical literature and expert evidence in the record to discern the accepted usage of the term "increased risk" in the applicable medical context, and in particular whether that accepted usage necessarily implies proof of causation.

The peer-reviewed medical literature in the record on the topic of suicide and abortion consistently uses the term "increased risk" to refer to a relatively higher probability of an adverse outcome in one group compared to other groups—that is, to "relative risk." *See ante* at 12 ("'Relative risk' refers to 'the ratio of the risk of disease among those exposed to a risk factor to the risk among those not exposed.'"). For example, one study compared the rate of suicide for women who had received induced abortions with the rates of suicide for two other groups, women who gave birth and women who miscarried. *See* Ex. 60, Mika Gissler et al., *Suicides After Pregnancy in Finland, 1987-94*, 313 Brit. Med. J. 1431, 1432 (1996), ECF No. 172-3. That study characterized its finding of a vastly higher suicide rate for women who received induced abortions as "an increased risk of suicide." *Id.* at 1434. Another study compared the rate of, *inter alia*, suicide ideation in women who had received induced abortions with the rates for women who gave birth and for women who had not become pregnant. *See* Ex. 61, David M. Fergusson et al., *Abortion in Young Women and Subsequent Mental Health*, 47 J. Child Psychol. & Psychiatry 16, 19 (2006), ECF No. 172-4. That study characterized its finding of higher rates of adverse mental

(agreeing with the district court "that the legislative drafters 'may not have fully understood the meaning of this phrase as used in the medical profession'"). Yet, if the legislature had intended the trivial meaning envisioned by the Court, it would have had no reason to use the term "increased risk" in the suicide advisory alone, rather than throughout subsection (e). For example, unlike the suicide advisory, the advisory regarding the risk of depression does not expressly state that it is an "increased risk," nor in fact does it reiterate any form of the term "risk" at all. *See* § 34-23A-10.1(1)(e)(i). Ironically, by refusing to adopt a construction of the term "increased risk" that gives effect to every word of the statute, it is the Court, rather than the state legislature, that fails to distinguish with any technical precision among the many possible meanings of the term "risk."

health outcomes for women who had induced abortions as "a detectable *increase in risks* of concurrent and subsequent mental health problems" for "young women expos[ed] to abortion." *Id.* at 22 (emphasis added).

Finally, the following definition of risk in the medical context was provided by Intervenors' expert, and is substantially in accord with the definitions of "absolute risk" and "relative risk" relied upon by the Court:

> Assessment of degree of risk is often expressed in terms of absolute risk, which relates to the chance of developing a disease over a time-period (e.g., a 10% lifetime risk of suicide) or in terms of relative risk, which is a comparison of the probability of an adverse outcome in two groups. For example, abortion would be considered an *increased risk* for suicide *if the relative risk is significantly higher* for women who abort compared to women who give birth or never have children.

Coleman Decl. ¶ 6, Jul. 6, 2006, ECF No. 189 (emphases added).

Based on the "accepted usage" of the term in the relevant field, *Peters*, 567 N.W.2d at 885, the term "increased risk" in subsection (ii) indicates that the "relative risk" definition is the one intended by the legislature for the suicide advisory. Noticeably absent from the contextual definition of "increased risk" is a requirement for proof of causation. This stands to reason, because, as explained by the Intervenors' expert:

> When examining complex human psychological and physical health outcomes, such as depression and suicidal behavior, identification of a single, precise causal mechanism applicable to all situations is not possible . . . .
>
> Given this inherent complexity, sound epidemiological evidence is nevertheless derived by identifying those variables which are most

strongly linked with adverse mental or physical health outcomes for large groups of individuals.

Coleman Decl. ¶¶ 5-6, Jul. 6, 2006. While such evidence of relative risk eventually may substantiate an inference of direct causation as further experiments rule out other plausible explanations, *see id.* at ¶ 9, conclusive proof of causation is not required in order for the identification of a medical risk.

Even the evidence upon which Planned Parenthood repeatedly relies (as does the Court today) is consistent with the "relative risk" definition of increased risk. For example, the report of the American Psychological Association's ("APA") Task Force on Mental Health and Abortion, Branson Decl. Ex. A, Sept. 8, 2008, ECF Nos. 283-3, 283-4 (hereinafter "APA Report"), decries the "tendency to confuse a risk and a cause" as a "logical fallacy." APA Report at 31. As another example, Planned Parenthood submitted into the record a letter to a medical journal from one of the researchers mentioned above. While the researcher emphasized that his studies linking suicide and abortion did not prove causation, he resolutely reiterated his finding of "increased risk." Mika Gissler et al., *Letter to the Editor: Pregnancy-Related Violent Deaths*, 27 Scand. J. Pub. Health 1:54, 55 (1999), ECF No. 206-10 (hereinafter "Gissler 1999"). It would be nonsensical for a study to find a relationship of "increased risk," but not causation, if the term "risk" itself was understood to indicate a causal link.

Finally, Planned Parenthood submitted into the record the label approved by the Food and Drug Administration ("FDA") for the abortion-inducing drug Mifeprex (mifepristone, also known as RU-486). The first paragraph of that label requires that the prescribing physician "inform the patient about the *risk* of these serious [listed] events," but expressly states that "[n]o causal relationship between the use of Mifeprex and misoprostol and these events has been established." Branson Decl. Ex. DD, at 1, Aug. 6, 2006, ECF No. 206-5 (emphasis added). Indeed, the FDA regulation governing that label requires that "[t]he labeling shall be revised to include

a warning as soon as there is reasonable evidence of an *association* of a serious hazard with a drug; *a causal relationship need not have been proved*." 21 C.F.R. § 201.80(e) (emphases added).[10]  Once again, it would be nonsensical for the FDA to require disclosure of "risks" in the absence of proof of a "causal relationship" if the term "risk" itself was understood to indicate a causal link.

In subsection (ii), the legislature required the disclosure of an "increased risk," not causation.  Based on the accepted usage of the term in the medical field, there is simply no support for the Court's conclusion that the meaning of the term "increased risk" in the context of § 34-23A-10.1(1)(e)(ii) implies a disclosure of a causal relationship.  Instead, subsection (ii) requires a disclosure simply that the risk of suicide and suicide ideation is higher for women who abort compared to women in other relevant groups, such as women who give birth or do not become pregnant.

II.

With regard to whether the required disclosure is truthful, *see Rounds*, 530 F.3d at 735, the State submitted into the record numerous studies published in peer-reviewed medical journals that demonstrate a statistically significant correlation between abortion and suicide.  The studies were published in respected, peer-reviewed journals such as the *Obstetrical and Gynecological Survey*, the *British Medical Journal*, the *Journal of Child Psychology and Psychiatry*, the *Southern Medical Journal*, and the *European Journal of Public Health*.  These journals rely on multiple independent expert reviewers to identify flaws in a study's data and methods before

---

[10]The quoted language formerly appeared in 21 C.F.R. § 201.57(e) (superseded June 30, 2006), under which the Mifeprex label was approved on September 28, 2000. *See* Branson Decl. Ex. CC, Aug. 6, 2006, ECF No. 206-4.  The requirements of former § 201.57 now appear in 21 C.F.R. § 201.80 and remain applicable to prescription drugs approved by the FDA prior to June 30, 2001, with certain exceptions. *See* 21 C.F.R. §  201.56(b).

publication, and there is no indication that the peer-review process was not followed for the studies at issue. While Planned Parenthood argues that these studies do not examine the correlation between abortion and suicide in sufficient detail to prove causation (as discussed in more detail in Part III), there is nothing in the record to suggest that the underlying data or calculations in any of these studies are flawed. For example, Planned Parenthood's own expert admitted that one of the studies, which determined a suicide rate after abortion of 31.9 per 100,000 as compared to a suicide rate after live birth of 5.0 per 100,000, "indicates an association; not causation, but an association" between abortion and suicide. Stotland Dep. 283:22-284:9, ECF No. 152-12.[11] When asked if she had "any quarrel with the validity of that association," the expert replied that she did not. *Id.* at 284:11-13.

Based on the record, the studies submitted by the State are sufficiently reliable to support the truth of the proposition that the relative risk of suicide and suicide ideation is higher for women who abort their pregnancies compared to women who give birth or have not become pregnant. It also is worth repeating that Planned Parenthood does not challenge the disclosure that abortion may lead to "[d]epression and related psychological distress." S.D.C.L. § 34-23A-10.1(1)(e)(i); *see also Gonzales v. Carhart*, 550 U.S. 124, 159 (2007) (stating that "[s]evere depression and loss of esteem can follow" an abortion). As a matter of common sense, the onset of depression and psychological distress also would increase one's risk of suicide and suicide ideation. *See, e.g.*, Ottar Bjerkeset et al., *Gender Differences in the Association of Mixed Anxiety and Depression with Suicide*, 192 Brit. J. Psychiatry 474, 474 (2008) ("Depression is thought to be the most important antecedent of

---

[11]With regard to another potential comparison group, the cited study also determined a suicide rate among women of reproductive age who did not become pregnant as in the range of 11.8 to 13.3 per 100,000. *See* Mika Gissler et al., *Injury Deaths, Suicides and Homicides Associated with Pregnancy, Finland 1987-2000*, 15 Eur. J. Pub. Health 5:459, 460 (2005), ECF No. 147-18.

suicide . . . .”).  Thus, there appears to be little dispute about the truthfulness of the required disclosure.[12]

## III.

Despite the extensive evidence in the record of an "increased risk" of suicide, Planned Parenthood contends that disclosure of the increased risk would be misleading or irrelevant to a patient seeking an abortion, *see Rounds*, 530 F.3d at 735, because certain authorities have indicated that there is no direct causal link.  In particular, Planned Parenthood argues that certain underlying factors, such as pre-existing mental health problems, predispose some women both to have unwanted pregnancies and to have suicidal tendencies, resulting in a misleading correlation between abortion and suicide that has no direct causal component.  Under this view, the required disclosure would be misleading or irrelevant to the decision to have an abortion because the patient's decision would not alter the underlying factors that actually cause the observed increased risk of suicide.

As an initial matter, I note that the usual medical practice reflected in the record is to *recognize* a strongly correlated adverse outcome as a "risk" while further

---

[12]Planned Parenthood also contends that the statute is invalid because an increased risk of suicide after abortion is not "known" as required by the statute.  *See* S.D.C.L. § 34-23A-10.1(1)(e) (requiring disclosure of "[a]ll known medical risks of the procedure").  This contention was premised on Planned Parenthood's argument that "increased risk" implies causation and that such a causal link is not generally "known."  Because the statute does not require disclosure of any causal link, Planned Parenthood's argument on this point is misdirected.  The record indicates that the disclosure actually required—that the relative risk of suicide and suicide ideation is higher for women who abort compared to women in other relevant groups—is generally "known."  For example, the APA commissioned a task force to produce the 91-page APA Report for the sole purpose of analyzing that known risk in more detail.  *See* APA Report at 5.

experiments are conducted to confirm or exclude other plausible causes. *See, e.g.*, Coleman Decl. of Jul. 6, 2006 (Dkt. #189), ¶ 9. In contravention of that usual practice, Planned Parenthood argues that the existence of other plausible causes *proscribes* the disclosure of suicide as a risk of abortion. There is no constitutional requirement to invert the traditional understanding of "risk" by requiring, where abortion is involved, that all other plausible explanations be ruled out first. Indeed, the Supreme Court "has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty," and "[m]edical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts." *Gonzales*, 550 U.S. at 163-64. In particular, "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992). There is no basis in the "non-misleading" and "relevant" requirements of *Casey* for imposing a new, stricter definition of medical risk—a standard that requires certainty of causation—simply because the medical procedure at issue is abortion.

Thus, the truthful disclosure regarding increased risk cannot be unconstitutionally misleading or irrelevant simply because of some degree of "medical and scientific uncertainty," *Gonzales*, 550 U.S. at 163, as to whether abortion itself plays a causal role in the observed correlation between abortion and suicide. Instead, Planned Parenthood would have to show that any "medical and scientific uncertainty" has been resolved into a certainty *against* any causal role for abortion. In other words, in order to render the suicide advisory unconstitutionally misleading, Planned Parenthood would have to show that abortion has been ruled out, to a degree of scientifically accepted certainty, as a statistically significant causal factor in post-abortion suicides. An examination of Planned Parenthood's evidence reveals that it cannot meet this burden.

First, Planned Parenthood points out that the scope of the FDA labeling regulations discussed above would appear to require a warning of increased risk of suicide for the abortion-inducing drug Mifeprex, if that risk were indeed valid. Because the actual label approved by the FDA does not include such a warning, Planned Parenthood argues that the FDA must have found that the increased risk of suicide after an abortion is not valid. However, an FDA-approved label does not represent the definitive or exclusive list of risks associated with a drug, because "[t]he FDA has limited resources to monitor the 11,000 drugs on the market, and manufacturers have superior access to information about their drugs." *Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 940-41 (8th Cir. 2011) (quoting *Wyeth v. Levine*, 555 U.S. 555, ----, 129 S. Ct. 1187, 1202 (2009)). Moreover, the record before us does not show whether any evidence of the link between abortion and suicide was submitted to the FDA, nor does it provide details of the FDA's analysis, if any, of the link. Thus, the FDA-approved label for Mifeprex yields no information as to whether abortion has been ruled out as a statistically significant causal factor in post-abortion suicides.

Second, Planned Parenthood argues, and the district court found, that the American College of Obstetricians and Gynecologists ("ACOG"), a well-known professional medical organization, "rejects any suggestion that increased risk of suicide and suicide ideation are known risks of abortion." 650 F. Supp. 2d at 983. Unfortunately, there was no evidence from ACOG in the record for the district court to consider. The only evidence in the record pertaining to ACOG's position is a second-hand reference in a 2005 report by the State's expert, Dr. Elizabeth M. Shadigian, that quoted two sentences from a single ACOG Practice Bulletin: "Long-term risks sometimes attributed to surgical abortion include potential effects on . . . psychological sequelae. However, the medical literature, when carefully evaluated, clearly demonstrates no significant negative impact on any of these factors with surgical abortion." Elizabeth M. Shadigian, Report to the S.D. Task Force to Study Abortion 4, Sept. 21, 2005, ECF No. 177-4 (hereinafter "Shadigian Report");

*see also* Ex. O, Shadigian Dep. 137-38, ECF No. 147-15 (quoting the recitation of those lines in the Shadigian Report). Dr. Shadigian further reported her opinion that ACOG's statement was erroneous and that "ACOG seems to claim that they have adequately evaluated the medical literature, but they do not consider our study or the many other studies we evaluated." Shadigian Report at 5. There is no other evidence in the record as to what "medical literature" ACOG considered, in what fashion it was "carefully evaluated," whether suicide was one of the "psychological sequelae" considered, whether ACOG's analysis received any independent peer review, or indeed whether a "Practice Bulletin" purports to be any sort of reliable scientific authority at all. The two unsupported sentences from an ACOG Practice Bulletin lend no credence to the argument that abortion has been ruled out as a statistically significant causal factor in post-abortion suicides.

Third, Planned Parenthood cites the previously mentioned APA Report. The six-person Task Force on Mental Health and Abortion that authored the APA Report reviewed "50 papers published in peer-reviewed journals between 1990 and 2007 that analyzed empirical data of a quantitative nature on psychological experiences associated with induced abortion, compared to an alternative." APA Report at 64. For some of the studies that found increased mental health risks associated with abortion, the APA Report identifies perceived methodological deficiencies, including an inability to limit the comparison group to women who carried unplanned or unwanted pregnancies to term. *See id.* at 68. Based on one study that attempted to account for that variable, the report states that "the *best* scientific evidence indicates that the relative risk of mental health problems among adult women who have an *unplanned pregnancy* is no greater if they have an elective first-trimester abortion than if they deliver that pregnancy." *Id.* (emphases in original). In the very same sentence, however, the report admits that the published literature could not provide "unequivocal evidence regarding the relative mental health risks associated with abortion per se compared to its alternatives (childbirth of an unplanned pregnancy)." *Id.*

The State and Intervenors argue that the APA Report is deficient in several respects. While the APA Report alleges methodological flaws in all of the studies that found a strong link between abortion and adverse mental health outcomes, it does not systematically list or analyze those flaws for each study considered. Instead, the report uses a handful of studies as illustrative examples. The State and Intervenors contend that this lack of rigor allowed the APA Report to analyze studies that found abortion to be "a benign experience for most women" less stringently than studies showing that abortion caused adverse effects. Coleman Decl. ¶ 14, Sept. 16, 2008, ECF No. 290-3. For example, while the APA Report suggests that the studies showing increased risk did not compare women receiving abortions to women who carried *unplanned* pregnancies to term, at least three studies purportedly considered by the task force did use such a control group, and each of those studies still "definitively indicated that abortion was associated with more mental health problems." *Id.* at ¶ 19. The APA Report also does not acknowledge that some of the studies showing increased risk did statistically control for other potential causal factors such as history of depression, anxiety, suicide ideation, childhood sexual abuse, physical abuse, child neuroticism, and low self-esteem. *Id.* at ¶ 15(c). As another example, although a high rate of attrition (i.e., the loss of subjects from a long-term study before the study is complete) is typically regarded as a methodological weakness, the APA Report downplays the significance of attrition, possibly because "the studies with the highest attrition rates [as high as 60%] . . . are also the ones that provide little evidence of negative effects" of abortion. *Id.* at ¶ 15(d). A number of published authors in the field contacted the APA to point out these problems and ask that the APA Report be retracted. *Id.* at ¶¶ 28-29.

At a minimum, it appears that many published authors in the field do not accept the opinion of the APA's six-person task force that the "best evidence" suggests that there is no real significance to the link between abortion and suicide. However, for purposes of the discussion that follows, I will accept the findings in the APA Report at face value. The crux of the matter is that while the APA Report states that the

evidence available at the time of its review is not "sufficient to support the claim that an observed association between abortion history and mental health was *caused* by the abortion," *id.* at 6 (emphasis added), it also concludes that the published literature is inconclusive and more research is needed "to disentangle confounding factors and establish relative risks of abortion compared to its alternatives," *id.* at 72; *see also id.* at 68 (admitting that the published literature could not provide "unequivocal evidence regarding the relative mental health risks associated with abortion per se compared to its alternatives (childbirth of an unplanned pregnancy)").

In other words, while the APA Report finds that studies to date have not established with certainty that abortion is a causal factor in post-abortion suicide, it also acknowledges that abortion has not been ruled out as a causal factor and that better-designed studies would be needed to do so.[13]  Thus, the APA Report provides

---

[13]The Court cites the APA Report for the proposition that "it is not possible to talk about any effect of abortion on suicide risk" without conclusive comparison data for "women who carry unwanted pregnancies to term." *Ante* at 14.  The Court does not explain by what authority the APA has become the sole arbiter of the discussion. To the extent the Court holds that the state legislature may not enact, and the federal courts may not affirm, policies that "contradict[] . . . the leading associations of experts in relevant fields," *ante* at 16, I note that the Supreme Court has squarely rejected this contention.  *Compare Gonzales*, 550 U.S. at 166 ("Considerations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends.") *with Gonzales*, 550 U.S. at 176 (Ginsburg, J., dissenting) (noting that the legislature's chosen balance contradicted "statements from nine professional associations, including ACOG," while "[n]o comparable medical groups supported" the legislature's position).

By attributing such unwarranted authority to the APA in this case, it appears that the Court has muted any "possible [] talk" about the issue for the foreseeable future.  While the APA waits for methodologically perfect research on the effect of "unwanted" or "unplanned" pregnancies, others have found such perfection is not achievable, because "pregnancies that are aborted frequently were initially intended by one or both partners and pregnancies that are initially unintended often become

-30-

no support for the proposition that abortion has been ruled out as a statistically significant causal factor in post-abortion suicides.

In short, although the record reflects some degree of "medical and scientific uncertainty," *Gonzales*, 550 U.S. at 163, as to whether abortion itself is a causal factor in the observed correlation between abortion and suicide, there is nothing in the record to suggest that abortion as a cause *per se* has been ruled out with certainty. As a result, the disclosure of that correlation as an "increased risk" is not unconstitutionally misleading or irrelevant under *Casey* and *Gonzales*.[14]

As a final matter, I address the Court's more general contention that "nothing in the advisory would prevent the unproven inference that the 'increased risk' mentioned in [the statute] is increased <u>by</u> abortion." *Ante* at 13. To the contrary,

wanted as the pregnancy progresses, rendering assessment of wantedness/intentedness [sic] subject to considerable change over time." Coleman Decl. ¶ 15, Jul. 6, 2006, ECF No. 189. In addition, "pregnancy wantedness/ intendedness is open to multiple subjective interpretations." *Id.* at ¶ 16. The APA Report does not specify what sort of data on these variables would be acceptable to resolve the issue to the APA's satisfaction, and the report even seems to conflate the entirely separate concepts of whether a pregnancy is "wanted" and whether it was initially "planned" or "intended." *See, e.g.*, APA Report at 64 ("These studies were evaluated with respect to their ability to draw sound conclusions about the relative mental health risks associated with abortion compared to alternative courses of action that can be pursued by a woman facing a similar circumstance (e.g., an unwanted or unintended pregnancy).").

[14]Although the issue is not presented, I would not preclude the possibility that a State could have an interest in requiring that a patient seeking an abortion be informed of risks that correlate with abortion, even if abortion were ruled out as a causal element. If an adverse event correlates with abortion solely due to the effect of independent underlying factors, a State nevertheless might wish to provide a warning to a patient who seeks an abortion, on the likelihood that the patient also shares the underlying causal factors.

physicians who provide abortions should be capable of reviewing the research in the field, understanding the difference between relative risk and proof of causation, and explaining it correctly to their patients, just as they should be capable of explaining the biological nature of the "human being" advisory. *See Rounds*, 530 F.3d at 736 ("The State's evidence suggests that the biological sense in which the embryo or fetus is whole, separate, unique and living should be clear in context to a physician."). Rather than "constrain[ing]" or "overriding" a physician's professional judgment, as the Court suggests, *ante* at 15, 16, the statute actually relies on the physician's judgment to present the underlying research in the field accurately. While the Court attempts to paint this requirement as extremely controversial, even some researchers who are skeptical of abortion's causal role nevertheless advocate disclosure of the increased risk of suicide to abortion patients. *See* Gissler 1999 at 55 (rejecting the idea that "an induced abortion in itself causes . . . suicide risk," but stating that "[t]he fact that some women who have an induced abortion are at risk for violent death [including suicide] within a year after the procedure should be acknowledged in the provision of abortion services.").

Accordingly, I would hold that the suicide advisory is not only truthful, but also non-misleading and relevant to the patient's decision to have an abortion.

IV.

In conclusion, I would hold that the requirements of S.D.C.L. § 34-23A-10.1(1)(e)(ii) are satisfied by a disclosure that the relative risk of suicide and suicide ideation is higher for women who abort compared to women in other relevant groups, as described in the relevant medical research. The statute does not require the physician to disclose that a causal link between abortion and suicide has been proved. The disclosure is truthful, as evidenced by a multitude of studies published in peer-reviewed medical journals that found an increased risk of suicide for women who had received abortions compared to women who gave birth, miscarried, or never became

-32-

pregnant. Various studies found this correlation to hold even when controlling for the effects of other potential causal factors for suicide, including pre-existing depression, anxiety, suicide ideation, childhood sexual abuse, physical abuse, child neuroticism, and low self-esteem.

Moreover, the suicide advisory is non-misleading and relevant to the patient's decision to have an abortion, as required by *Casey*. The standard medical practice is to inform patients of significant risks that have been associated with a procedure through medical research, even if causation has not yet been proved. While Planned Parenthood points to uncertainty as to whether abortion itself is a causal factor in the observed correlation to suicide, as opposed to other factors that tend to be associated independently with both abortion and suicide, the Supreme Court "has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty," including "in the abortion context." *Gonzales*, 550 U.S. at 163-64. Thus, a truthful disclosure cannot be unconstitutionally misleading or irrelevant simply because some degree of medical and scientific uncertainty persists. To be sure, informed consent requirements "must be calculated to inform [a] woman's free choice, not hinder it," *ante* at 16 (quoting *Casey*, 505 U.S. at 877), but there is no unconstitutional hindrance on the woman's choice where, as here, the State merely is using "its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion," *Rounds*, 530 F.3d at 735. I would hold that, on its face, the suicide advisory presents neither an undue burden on abortion rights nor a violation of physicians' free speech rights.

Accordingly, I respectfully dissent from the Court's holding in Part II. C.

_____